J-A22012-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R.G., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| I.G., W.G.M., AND YORK COUNTY CHILDREN AND YOUTH SERVICES, | |
| Appellee | No. 2177 MDA 2014 |

Appeal from the Order Entered November 26, 2014
In the Court of Common Pleas of York County
Civil Division at No(s): 2012-FC-001208-03

BEFORE:  BOWES, JENKINS, AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                **FILED OCTOBER 02, 2015**

R.G. ("Grandmother") appeals from the order awarding York County Office of Children, Youth, and Families ("CYF") sole legal custody and primary physical custody of her granddaughter, Y.M.-V, in this custody action.  We affirm.[1]

_____

[1] Excluding tables and appendices, Grandmother's brief is sixty-two pages long.  Pursuant to Pa.R.A.P. 2135, a principal brief is limited to 14,000 words, and when the the brief exceeds thirty pages, the appellant must certify with the appellate court that the brief complies with the word limitation.  Herein, Grandmother failed to file the certification or request permission to exceed the word limit.  However, since Grandmother's violation of Pa.R.A.P. 2135 was not so defective so as to preclude effective appellate review, we decline to dismiss the brief or quash the appeal.  ***See In re Estate of Glover***, 669 A.2d 1011, 1017 (n.1) (Pa.Super. 1996)
*(Footnote Continued Next Page)*

* Retired Senior Judge assigned to the Superior Court.

Y.M.-V. was born out of wedlock during September 2006. During the spring of 2012, Y.M.-V. witnessed her birth father stab her pregnant mother to death in a motel lobby.[2] In a related dependency action, on May 31, 2012, the juvenile court adjudicated Y.M.-V. dependent and awarded legal custody to CYF. CYF placed Y.M.-V. with her maternal aunt, I.G. ("Aunt"). Although CYF had initially identified Grandmother as a potential kinship resource for Y.M.-V., it ultimately elected to place the child with Aunt, a pre-adoptive resource, where she remains. While Grandmother stipulated that Y.M.-V. was a dependent child, she disagreed with the disposition order placing Y.M.-V. with Aunt. She appealed the juvenile court's adjudication and disposition, and we affirmed. ***See In The Interest of Y.M.-V.***, 68 A.3d 371 (Pa.Super. 2013) (unpublished memorandum).

Meanwhile, on June 29, 2012, Grandmother filed this custody action against Aunt, Father, and CYF seeking legal and sole physical custody of her

---

*(Footnote Continued)* ————————————

("While we agree that the brief, which contains 69 pages, does violate the page limitation of Pa.R.A.P. 2135, . . . [s]ince the brief is not so defective as to preclude effective appellate review, we will not quash the instant appeal.").

[2] The trial court indicates that the murders occurred during May of 2012; however, the relevant criminal docket identifies the date of the offenses as March 29, 2012. As of the date of this memorandum, birth father is awaiting trial on two counts of first-degree murder.

granddaughter.[3]  Noting the ongoing dependency proceedings, the trial court dismissed the custody petition as inappropriate and ostensibly premature under its interpretation of the prevailing case law.  This Court disagreed. Reasoning that the then-newly enacted Child Custody Act, 23 Pa.C.S. §§ 5321-5340, specifically conferred standing upon a grandparent to seek custody of a child that had been adjudicated dependent, we reversed the order dismissing Grandmother's custody complaint and remanded the matter for further custody proceedings.  *See R.G. v. I.G.*, 87 A.3d 376 (Pa.Super 2013) (unpublished memorandum at 6-7) ("The new Custody Act . . . confers standing upon grandparents in cases where 'the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters), where the precedent requirements of Section 5324(3)(i) and (ii) are also met.'").  The Supreme Court denied *allocatur* on November 26, 2013.  *R.G. v. I.G.*, 81 A.3d 78 (Pa. 2013).

On remand, the trial court entered an interim custody order that, *inter alia*, authorized pertinent evaluations, studies, and investigations.[4] Consistent with this order, Grandmother requested that Aunt participate in a

---

[3] Birth father's parental rights were terminated on September 18, 2014. He is no longer a party to the custody proceedings.

[4] Peter Vaughn, Esquire, is the guardian *ad litem* in the dependency proceedings.  On January 21, 2014, the trial court entered an order extending that appointment to the custody case.

custody evaluation conducted by Kasey Shienvold, Ph.D.[5] Between January and April 2014, Aunt completed two interviews with Dr. Shienvold, and completed a Minnesota Multiphasic Personality Inventory ("MMPI");[6] however, she rebuffed subsequent requests to participate in additional hour-long interviews and an interactional evaluation with Y.M.-V. Dr. Shienvold also wanted to interview Aunt's husband and to have the husband complete an MMPI, but the husband refused.

On July 11, 2014, Grandmother filed a petition for contempt and special relief seeking, in pertinent part, Aunt's participation in the custody evaluation. The trial court did not immediately address the petition. Instead, it considered the petition within the context of the two-day custody trial, which commenced on November 20, 2014. Grandmother testified on her own behalf and presented evidence from her son, N.G, his former paramour, J.L., who translated Grandmother's early communications with CYF, and Dr. Shienvold, who testified as a fact witness regarding the petition for contempt. CYF presented testimony from Y.M.-V.'s outpatient therapist, the caseworker who supervises Grandmother's visitation, Aunt, and a

---

[5] Although the trial court order entered on March 20, 2014, misidentified the custody evaluator as Arnold Shienvold, the certified record confirms that Grandmother retained Dr. Kasey Shienvold to perform the custody evaluation.

[6] The MMPI is a psychological assessment that custody evaluators commonly employ as one component of a custody evaluation.

different maternal aunt who helps provide child care for Y.M.-V. Additionally, the trial court interviewed Y.M.-V. *in camera*. After the close of testimony, the guardian *ad litem* recommended that the trial court grant Grandmother one six-hour period of unsupervised physical custody per month.

On November 26, 2015, the trial court issued an opinion and order that addressed each of the enumerated best-interest custody factors in 23 Pa.C.S. § 5328(a), which we reproduce *infra*, and awarded CYF legal and primary physical custody. Despite the guardian *ad litem*'s recommendation to increase the extent of grandmother's unsupervised contact with Y.M.-V., the trial court granted Grandmother one hour of supervised custody per month. This timely appeal followed.

Grandmother complied with Pa.R.A.P. 1925(a)(2)(i) and (b) by filing a concise statement of errors complained of on appeal contemporaneous with her notice of appeal. Thereafter, the trial court issued a Rule 1925(a) opinion that addressed Grandmother's additional allegations of error that it had not confronted in the opinion and order entered on November 26, 2015. The matter is ready for our review.

Grandmother raises the following five issues:

A. Whether the custody court committed prejudicial errors and/or abused its discretion by failing to address at all the contempt issues related to Aunt's failure to participate in the custody evaluation, including but not limited to an award of fees, costs and expenses under 23 Pa.C.S. §5339, and by failing to

enforce Aunt's participation in a custody evaluation as the court has an obligation to develop independently a complete record in a custody case.

B. Whether the custody court committed prejudicial errors and/or abused its discretion by failing to order any kind of family counseling as permitted under 23 Pa.C.S. § 5333 in order to support the best interest of [Y.M.-V.] in creating a situation where she could have contact with all extended family in a less conflicting setting?

C. Whether the custody court committed prejudicial error and/or abused its discretion by limiting the maternal grandmother's contact with [Y.M.-V.] to only one supervised visit per month without a reasonable basis in that such limited contact does not permit the development of a bond or permit contact with other extended family during the visit?

D. Whether the custody court committed prejudicial error and/or abused its discretion by failing to award primary physical custody to maternal grandmother, who was the only person who had standing to maintain a custody action under the Custody Act?

E. Whether the custody court violated Appellant's rights under the Custody Act and committed prejudicial error and/or abuse[d] [its] discretion in its disparate treatment of exhibits, witnesses and appointment of counsel between Aunt and maternal grandmother?

Appellant's brief at 5-6.[7]

_____

[7] We are dismayed that neither CYF, the party that actually possess legal and physical custody of Y.M.-V., nor Attorney Vaughn, whose appointment requires him to represent the child's interests throughout the custody proceedings, filed briefs in this matter. We are particularly troubled by Attorney Vaughn's apathy in light of the fact that the trial court declined his express recommendation that Grandmother receive a six-hour block of unsupervised physical custody. N.T., 11/20-21/14, at 251-252. Although the guardian *ad litem*'s recommendation is advisory, this Court doubtlessly would have benefited from a brief outlining his perspective. **C.W. v. K.A.W.**,
*(Footnote Continued Next Page)*

Our standard of review in custody matters is as follows:

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. *M.P. v. M.P.*, 54 A.3d 950, 953 (Pa.Super. 2012). Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence. *Id*. We defer to the trial judge regarding credibility and the weight of the evidence. *Id*. The trial judge's deductions or inferences from its factual findings, however, do not bind this Court. *Id*. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings. *Id*.

*S.W.D. v. S.A.R.*, 96 A.3d 396 (Pa.Super. 2014). Additionally, mindful that the polestar of any custody determination is the best interest of the child, we will not disturb a custody order so long as it is free from error and the certified record reveals that the trial court's consideration of the child's best interest standard was "careful and thorough." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014) (citations omitted). Ultimately, "[t]he test is whether the evidence of record supports the trial court's conclusions." *Id*. (citations omitted).

The contentions that Grandmother levels in issues A, B, and E all concern matters that implicate the trial court's review of the § 5328(a) best-interest factors tangentially. First, Grandmother complains that the trial

*(Footnote Continued)* ────────────

774 A.2d 745 (Pa.Super. 2001) (guardian's custody recommendations are advisory). Indeed, even if the guardian *ad litem* was unable to fashion a legal argument in support of his recommendation, it would have benefited our review if he had filed something with this Court to explain his reasons for proposing the extended period of unsupervised custody.

court erred in failing to find Aunt in contempt for neglecting to cooperate with Dr. Shienvold's custody evaluation. Second, Grandmother assails the trial court's decision to forego family counseling between Grandmother and Aunt. Finally, she complains of the trial court's disparate treatment of her generally. We address these issues at the outset.

As it relates to the contempt petition, Grandmother asserts that Aunt's failure to participate fully in the custody evaluation essentially derailed Dr. Shienvold's efforts insofar as he concluded that he could not prepare a complete evaluation prior to the then-scheduled hearing date without Aunt's further cooperation. In rejecting Grandmother's assertion and request for $1,300 in costs and fees, the trial court observed, *inter alia*, that even though Aunt's noncompliance contributed to Dr. Shienvold's delay, once the court postponed the custody trial from late-August to mid-November, Dr. Shienvold had sufficient time to perform the required interviews and to prepare a custody evaluation report. However, since Grandmother failed to inform Dr. Shienvold of the continuance, he abandoned his efforts, and formally terminated his service as the custody evaluator on July 8, 2014. The certified record supports the trial court's finding.

In response to Aunt's cross-examination as to why he did not follow up on her request to provide alternative dates to complete the evaluation interviews after July 2014, Dr. Shienvold testified, "I was unaware that the deadline for the report had been extended. So I was under the impression

that—that I wasn't able to meet the deadlines of the court still. I did not know [the case] was pushed back until the end of November." N.T., 11/20-21/14, at 178. Thereafter, responding to the trial court's inquiry, Dr. Shienvold continued, "That would have given me another two months. . . . [T]hat would have been certainly enough time—another two months before the report was due[,] would have been enough time to complete the evaluation." *Id*. at 179. In light of the foregoing, we do not disturb the trial determination that the sanctions Grandmother requested were not warranted.

To the extent that Grandmother contends that the factual record was insufficient due to the lack of a custody evaluation, we also reject this assertion. Neither the Child Custody Act nor our case law requires a trial court to order a custody evaluation. Like parental assessments and co-parenting counseling, a custody evaluation is but one instrument at the trial court's disposal to help determine a child's best interest. While the trial court initially believed that the custody evaluation was warranted in this case, after hearing the various fact witnesses testify at the custody trial, it was able to weigh the statutory best interest factors without the assistance of a custody evaluation. It is clear that Grandmother is dissatisfied with the trial court's custody decision; however, she failed to identify any specific benefit that would inure to her from a custody evaluation. She merely raises the generalized complaint, "An evaluation would have undoubtedly avoided

the many mistakes made by the Court as evidenced in the record and as argued on appeal." Appellant's brief at 35. Unfortunately for Grandmother, since she does not actually identify any reversible errors or acts that are tantamount to an abuse of discretion, her generalized complaint is unpersuasive. Stated simply, while a custody evaluation undoubtedly would have provided additional insight on the child's psychological and developmental needs, the trial court's consideration of the statutory best-interest factors in light of the evidence presented at trial was sufficient in this case. No relief is due.

Next, Grandmother objects to the trial court's decision to forego family counseling. Pursuant to 23 Pa.C.S. § 5333, "The court may, as part of a custody order, require the parties to attend counseling sessions." Instantly, the trial court ordered individual counseling for Y.M.-V. but declined to impose family counseling for Grandmother, Aunt, and the extended family. In its Rule 1925(a) opinion, the trial court explained that it did not believe that family counseling was necessary to Y.M.-V.'s best interest in light of the individualized counseling that she received.

Grandmother argues that the trial court's invocation of Y.M.-V.'s individual counseling misses the mark. She contends that, unlike the child's counseling, family counseling would have helped the remaining family members quell the animosity between the respective factions that support Grandmother and Aunt. She asserts that the trial court's decision to forego

family counseling was tantamount to an abuse of discretion because it would have reduced the level of conflict among the family members, allowed Grandmother and Aunt to reconcile their differences, and permitted the family as a whole to pursue Y.M.-V.'s best interest.

We agree with Grandmother in the broad sense that family counseling is designed to confront different issues than the individualized counseling Y.M.-V. currently receives. We also recognize that, if effective, family counseling undoubtedly would inure to the child's best interest. Nevertheless, we disagree with Grandmother's ultimate contention that the trial court abused its discretion in failing to exercise its statutory authority to order family counseling under § 5333(a). Stated plainly, Grandmother's allegations of error presupposes that she, Aunt, and the remaining family members would benefit from counseling. However, the certified record belies this conclusion. To the contrary, the record evinces a toxic relationship between Grandmother and Aunt and a family dynamic that is tragically resistant to counseling.

Indeed, during the custody trial, it was revealed that Grandmother and Aunt previously engaged in family counseling and that those efforts were futile. Grandmother testified that, following the birth mother's death, she and Aunt initiated counseling in order to improve their relationship. N.T., 11/20-21/14, at 24. However, counseling failed. Grandmother, explained, "everything stood the same." *Id*. In addition to that unsuccessful attempt,

Grandmother and Aunt participated in at least one other meeting that was designed to improve their communication with each other. *Id*. It also failed to close the familial rift. *Id*. at 24-15.

J.L., Grandmother's translator, participated in that meeting and provided the custody court with the following description.

> There was a family meeting to try and bring everybody together for the sake of [Y.M.-V.] for visitation, custody to bring the family together. So it was a family gathering that was initiated. Children and Youth were there. Peter Vaughn was there. All of the parties were there.
>
> It seemed to be going well. There [were] hugs between [Grandmother] and [Aunt], myself and [Aunt], [Mother's son N.G.] and [Aunt]. And then when the parties such as the attorneys and Child and Youth left the room for us to discuss things, the parties went their separate ways. They had a plan of action. And we were left to present some type of plan of action.
>
> The parties did not come together for a plan of action for [Y.M.-V] [and] the family to be together. And that's what the family meeting was [intended to accomplish].

*Id*. at 137-38. Thus, the prior attempts to engage in counseling for Y.M.-V's benefit have been fruitless.

Additionally, Y.M.-V.'s counselor, Christina Schadewald, testified that Aunt and Grandmother engaged in family counseling in Lancaster, Pennsylvania with Mario Dinenna, a Spanish-speaking counselor who was formally in Ms. Schadewald's office at the Community Services Group. *Id*. at 88-89. Although Ms. Schadewald did not participate in the family

counseling session, Grandmother's son, N.G., testified that the session quickly devolved into a shouting match. He depicted the episode as follows:

> So [Grandmother] went ahead. She went in. And the doctor asked me if I could leave. So I said, yes. And once I left when [Aunt] was there, [Aunt] started screaming and yelling, going crazy, and everyone could hear her.
>
> And the report that they made said that [Grandmother] was the one yelling. [Grandmother] is not like that.

*Id* at 124-25. J.L., described the incident in greater detail:

> [Grandmother and Aunt] entered into the room with the counselor. I believe his name was Mario. I believe Tina Schadewald's office is the same location. [Aunt] did not want me present in the room. Myself and [N.G.] were requested to leave per Mario because [Aunt] did not want us there. She wanted the meeting.
>
> It was just going to be her and [Grandmother]. So . . . [N.G.], and myself were put out. We were in a room very close. We could overhear everything that was going on. They were in there for about an hour. The counselor was interrupting many a time.
>
> I heard [Aunt's] voice very loud attacking [Grandmother]. The conversation did not go very well. At points I was ready to go in there and pull [Grandmother] out of the meeting because it wasn't going well at all.
>
> . . . .
>
> [Aunt] was angry with [Grandmother] because . . . remarks were made. I know that is something that was said, saying that she is not her mother, she is not her daughter; that the counselor wanted [Grandmother] to apologize for certain things that were said. [Grandmother] said that she would apologize. [Aunt] stated she wasn't going to take any apologies. It was just -- **there was no conversation really regarding [Y.M.-V.]**. It was a conversation of [Aunt] just verbally attacking [Grandmother].

- 13 -

*Id*. at 136-37 (emphasis added). Regardless of which party was at fault for derailing the attempted counseling sessions or who instigated the resulting arguments, the record demonstrates that Aunt and Grandmother, in fact, attempted a second time to initiate family counseling for Y.M.-V's benefit and their enmity consumed those discussions. Contrary to Grandmother's contentions on appeal, the foregoing testimony does not establish that the trial court abused its discretion in declining to resubmit Aunt and Grandmother to family counseling under the facts and circumstances of this case.

The third issue that we address concerns the trial court's alleged bias in favor of Aunt. Grandmother asserts that "the custody court violated her rights under the Custody Act in several ways, essentially demonstrating bias against her as well as some animus, not only at trial, but in the preceding proceedings [during] the past [three] years." Appellant's brief at 57. This claim has three components: (1) the trial court permitted CYF to incorporate the dependency record over her objection; (2) the trial court treated the parties' respective witnesses' opinion testimony differently; and (3) the trial court appointed counsel to represent Aunt throughout the dependency and

custody proceedings but neglected to appoint counsel for Grandmother. These arguments are meritless.[8]

In addressing these complaints the trial court observed that, while it took judicial notice of the entries on the juvenile docket, it did not take judicial notice of any facts in the dependency proceedings. It also stressed that it permitted Grandmother to review the list of docket entries and record of the juvenile court proceedings. As it relates to the remaining claims, the court highlighted that both Ms. Schadewald and Dr. Shienvold were presented as fact witnesses and neither witness was permitted to proffer an expert opinion. Finally, the trial court pointed out that Grandmother retained private counsel prior to initiating the custody litigation, maintained legal representation, and never requested court-appointed counsel.

The certified record supports the trial court's findings on all three counts. First, as it relates to the incorporation of the dependency record, the certified record demonstrates that while CYF initially requested to incorporate the dependency proceedings in its entirety, it revised that request and limited it to "pleadings filed of record" in the dependency court. N.T., 11/20-21/14, at 11. The trial court interpreted that entreaty as a

---

[8] We note that Grandmother does not assert that the alleged errors constitute reversible error in themselves; rather, she argues that the purported missteps evidence the court's partiality. Accordingly, our review focuses primarily upon Grandmother's claims of alleged bias.

request "to incorporate the docket," and concluded, "I'm going to incorporate the actions and proceedings in the docket in the dependency matter in this matter." *Id*. at 12, 13. The trial court granted Grandmother's request to examine that record, and entered an order to facilitate her review of the sealed juvenile court record. *Id*. at 162-163.

As noted, *supra*, the trial court stated that it took judicial notice of the docket entries but did not consider any facts in the juvenile court record. Rule 1925(a) Opinion at ¶ 5. Our review of the trial court's best-interest analysis confirms that the trial court did not rely upon any testimony that was not adduced during the two-day custody proceeding, and Grandmother's protestations do not allege any specific instances that would refute the trial court's assertion that it did not consider any extra-judicial facts. Thus, this aspect of her bias claim is unpersuasive.[9]

_____

[9] As the trial court did not rely upon any facts gleaned from the juvenile court record, we find no basis for relief. However, this disposition should not be interpreted as an imprimatur on the practice of incorporating by reference the entirety of a juvenile court record into a custody case. Indeed, that action is particularly problematic where, as here, one of the custody litigants was not a party to the dependency proceedings and had limited legal rights, if any, before the juvenile court. Absent a stipulation, the preferred practice would be for the petitioning party to present the relevant portions of the dependency record, redacted, if necessary, to the trial court as an exhibit for admission into evidence. This practice would alleviate the precise issue that confronted Grandmother in the case at bar, *i.e.*, her inability to confirm the contents of a sealed record that she had no legal authority to access.

Next, we address the trial court's alleged disparate treatment of the parties' respective fact witnesses. The crux of this contention is that, while the trial court permitted a CYF fact witness to proffer her lay opinion of Y.M.-V.'s progress in therapy and the child's preparation for adoption, it precluded Grandmother from adducing Dr. Shienvold's lay opinion about Y.M.-V's relationship with Grandmother. We find that the certified record belies Grandmother's assertion of partiality.

Pa.R.E. 701, regarding opinion testimony by lay witnesses, provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

The following facts are relevant. On the second day of testimony, Grandmother proffered Dr. Shienvold to testify in relation to the pending contempt petition against Aunt. That is, Dr. Shienvold was presented to explain how Aunt's lack of cooperation impeded his ability to complete the custody evaluation or produce an expert report. *Id*. at 176. During the ensuing direct examination, Dr. Shienvold testified about Aunt's level of cooperation. However, the trial court sustained CYF's objections to

Grandmother's attempts to inquire about the substance of Dr. Shienvold's incomplete evaluation or his opinion regarding the bond that he observed between Y.M.-V. and Grandmother. *Id*. at 166-167. The court permitted Dr. Shienvold to relay the facts of his discussion with Aunt regarding the level of conflict in the family, generally. Likewise, Dr. Shienvold outlined Grandmother's perspective of the family dynamic and summarized his interview with Y.M.-V.

In contrast to the limited purpose of Dr. Shienvold's lay testimony, CYF presented Y.M.-V.'s therapist, Christina Schadewald, to discuss the child's treatment for post-traumatic stress disorder and to describe the therapist's interactions with Y.M.-V. as the agency's focus turned toward Aunt's potential adoption. During direct examination, Ms. Schadewald explained that the focus of therapy veered away from dealing with the grief associated with tragedy and toward the possibility of her adoption. The therapist discussed the meaning of adoption with Y.M.-V. and how it would apply to her. Ms. Schadewald further elucidated, "[Y.M.-V.] ha[d] some misperceptions about what [adoption] meant. So I was working with her to have a better understanding of what [it] [entailed]. *Id*. at 73. In discussing this dynamic and how the child would be affected by the potential adoption, CYF inquired if Y.M.-V. appeared to have bonded with Aunt and her household. The trial court overruled Grandmother's objection to the question as calling for opinion testimony. Later, after Ms. Schadewald

explained how Y.M.-V. omitted Grandmother from a hand-drawn depiction of her "family," CYF inquired whether Y.M.-V. understood that any potential adoption would necessarily involve Aunt, and asked whether the child felt "secure and safe with that concept?" Grandmother objected to the question as calling for an opinion, and, again, the trial court overruled the objection.

The difference between the trial court's treatment of the two witnesses' lay opinion testimony was based on the fact that the witnesses were presented for different purposes. Neither Dr. Shienvold nor Ms. Schadewald was qualified by the trial court as experts to testify in the form of opinion. Accordingly, neither witness submitted an expert report or purported to testify as an expert in the custody case. Those are the only similarities between the two witnesses' roles in this matter. Dr. Shienvold had no contact with the family outside of his role as Grandmother's hand-picked custody evaluator. The evaluation was never completed, however, and the purpose of his testimony was limited to Aunt's lack of full cooperation with the custody evaluation process and his interactions with Y.M.-V. during the partial evaluation.

In contrast, Ms. Schadewald was presented to discuss Y.M.-V's therapy, which, at that juncture, included preparing for a potential adoption. Thus, while Grandmother sought to adduce Dr. Shienvold's lay opinion regarding the substance of the incomplete custody evaluation as an end-run around the requirements of a qualified expert, the context of Ms.

Schadewald's opinion testimony aligned squarely with Rule 701. Stated plainly, that testimony was based on Ms. Schadewald's perception of her therapeutic interactions with Y.M.-V., it was helpful to discern Y.M.-V.'s understanding of, and readiness for, the anticipated adoption, and it was not based on scientific, technical, or other specialized knowledge beyond the fact that Y.M.-V. omitted Grandmother from a drawing depicting her "family." No relief is due.

The final allegation of bias stems from the fact that the trial court appointed counsel to represent Aunt in her capacity as "Maternal Aunt/Kinship Parent." Trial Count Order, 5/9/14, at 1. Preliminarily, we highlight that there is no right to counsel in child custody litigation. *Karch v. Karch*, 879 A.2d 1272, 1274 (Pa.Super. 2005) ("There is no right to counsel in divorce, custody, or support proceedings."). Thus, the appointment of counsel in this case was an exercise of the trial court's discretion.

While it is not clear from the record, the trial court apparently appointed counsel for Aunt in the custody case because, as a pre-adoptive resource, Aunt had been granted representation in the underlying dependency proceedings that this custody action sought to collaterally challenge. As a named respondent to Grandmother's custody complaint, Aunt is a peripheral participant in the custody litigation with no legally cognizable right to custody beyond the custodial interest that she derives

from CYF. However, as Y.M.-V.'s pre-adoptive parent, Aunt's full participation in the custody litigation is undoubtedly essential to the trial court's determination of the child's best interest. This reality is highlighted by the fact that the trial court's consideration of the best interest factors focused primarily upon Y.M.-V's relationship with Aunt. Consequently, the trial court's decision to appoint counsel on Aunt's behalf as "Kinship Parent" was an exercise of discretion rather than an example of partiality.

Furthermore, the certified record confirms that Grandmother has maintained legal representation since she initiated the custody action, and she **never** requested that the trial court appoint counsel to represent her in this lawsuit. We reject as unfounded Grandmother's flippant supposition that the trial court would have denied her request for counsel had she asked. Grandmother's assertions of bias and partiality are baseless.

Having disposed of Grandmother's ancillary complaints regarding Aunt's contempt, the trial court's judicial notice of the juvenile court docket, and her allegedly disparate treatment, we next address the merits of the trial court's custody determination. When awarding any form of custody, the Child Custody Law provides an enumerated list of factors a trial court must consider in determining the best interests of a child:

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all

relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

In addition, in cases involving the award of partial physical custody to grandparents and great-grandparents, § 5328(c) states:

(1) In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2)(relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:

(i) the amount of personal contact between the child and the party prior to the filing of the action;

(ii) whether the award interferes with any parent-child relationship; and

(iii) whether the award is in the best interest of the child.

(2) In ordering partial physical custody or supervised physical custody to a parent's parent or grandparent who has standing under section 5325(3), the court shall consider whether the award:

(i) interferes with any parent-child relationship; and

(ii) is in the best interest of the child.

23 Pa.C.S. § 5328(c).

Herein, Grandmother had standing to seek partial physical custody under § 5325(1) due to the fact that birth mother was deceased. However, the trial court did not specifically delineate the applicable factors in § 5328(c) (i) and (iii), *i.e.*, the level of contact between Y.M.-V. and Grandmother prior to the custody litigation and whether the award of one hour supervised physical custody was in the child's best interest. Consistent with the custody statute, however, the trial court's opinion and order did, in fact, address the substance of the pertinent considerations in fashioning the custody arrangement. As Grandmother does not challenge the trial court's failure to address separately subsection (c) and because the certified record supports the trial court's best-interest determination under § 5328(a), we overlook the procedural misstep as harmless error.

Next, we turn to the merits of Grandmother's substantive argument, which she asserted in paragraphs "C" and "D" of her statement of questions presented. This Court has stated that, "**[a]ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa.Super. 2011) (emphasis in original). Instantly, the trial court determined that factors

seven, eleven, twelve, fourteen, and fifteen were either neutral or inapplicable to the facts of this case. All of the remaining factors militated in favor of CYF, based either on the benefit of Aunt's interactions and relationship with Y.M.-V., the agency's involvement, or maintaining the status *quo*.

Grandmother does not challenge the court's considerations of any specific factors.[10] Instead, she invokes her "favored position" as a grandparent and argues that the trial court erred in failing to relax her burden of proof and weigh its considerations of the best-interest factors thorough the prism of her elevated claim to physical and legal custody of her grandchild. She entreats that we reverse the trial court and remand with instructions to either increase her one-hour period of partial physical custody to a six-hour-block of unsupervised physical custody consistent with the guardian *ad litem*'s recommendation or hold a new trial for a "fresh look"

---

[10] An aspect of Grandmother's argument assails the trial court's decision to discount then-eight-year-old Y.M.-V.'s stated desire to visit Grandmother more often. Based upon the child's interactions with the trial court during the *in camera* interview, the trial court did not give the child's preference any weight. Our review of the certified record supports the trial court's decision. **See** N.T., 11/20-21/14, at 231-248; **Johns v. Cioci**, 865 A.2d 931, 943 (Pa.Super. 2004) ("We are mindful that the child's preference is not controlling and that the trial judge is in the best position to determine the weight to be given to the child's preference [based upon maturity, intelligence and ability to form well-reasoned opinion]").

before a different trial court. Grandmother's brief at 57. For the following reasons, we decline Grandmother's requests.

As noted, Grandmother's argument is predicated upon the assertion that, as a grandparent, she is entitled to a favored position over other third-party custody litigants. In support of this position, Grandmother relies upon (1) provisions in the current Child Custody Law that extend standing to grandparents under §§ 5324(3) and 5325; (2) repealed sections involving standing in the former custody law; and (3) case law addressing grandparent standing vis-à-vis other third parties under the repealed law. Tellingly, Grandmother fails to cite to a single case in support of her legal proposition that flows from the current Child Custody Law that became effective on January 24, 2011.

Grandmother's argument overstates the significance of her status as a grandparent. The preferential positon that Grandmother attempts to invoke relates to standing rather than a substantive lean that affects the trial court's custody termination. The relevant precept arises from **Martinez v. Baxter**, 725 A.2d 775, 779 (Pa.Super. 1999), *aff'd sub nom*. **R.M. v. Baxter ex rel. T.M.**, 777 A.2d 446 (Pa. 2001), wherein we quoted a passage from Pennsylvania Family Law Practice and Procedure (4th ed.) regarding the unique position of grandparents in custody cases in relation to to other third-parties who lacked standing to petition for custody unless they stood *in loco parentis*. However, it is obvious from both the context of our

discussion in that case and the authority that the esteemed treatise cited in support of the proposition stated therein, that the preference relates only to standing to initiate custody litigation.

*Martinez* involved our review of a trial court order sustaining preliminary objections to a grandmother's custody complaint. In vacating the trial court order, we reiterated, "Grandparents occupy a favored position among other third parties in custody disputes, and have standing to petition for physical and legal custody from a natural parent, provided that [they satisfy the remaining statutory requirements]." *Id*. at 778 (quoting Wilder, Pa. Family Law Prac. and Proc. (4 th ed.), § 28–4 at 340.). Examination of the treatise from which the Court borrowed the quote reveals that the principle is tied to the former custody law's grant of standing to grandparents in custody actions in certain situations. Specifically, the accompanying footnote reveals, "The statute was amended in 1996 to afford standing to grandparents, thereby legislatively overruling those cases holding that grandparents were to be treated as any other third parties in custody legislation." Wilder, Pa. Family Law Prac. and Proc. (4th ed.), § 28–4, n.10 at 343. Nothing in *Martinez*, or the treatise that we relied upon therein, supports Grandmother's instant claim that the "favored position" that she enjoys equates to a substantive preference or a relaxed burden of proof. Indeed, in vacating the trial court's order in *Martinez*, we not only excluded any reference to practical favoritism, but we also reiterated that

the polestar of all custody determinations is the best interests of the child. We stated, "Grandmother did not have the opportunity to be heard on her petition and did not have an evidentiary determination as to whether it was in the **best interests of** [**the child**] to be placed in her custody." *Id*. at 778-779 (emphasis added). Our Supreme Court confirmed this positon on appeal. *See R.M. supra*, at 451 n.4. ("It must be recognized, however, that the legislature's conferral of automatic standing to seek the physical and legal custody of a grandchild does not affect a grandparent's evidentiary burden to prove his/her custody claim on the merits."). Thus, we find unpersuasive Grandmother's instant claim that the trial court erred in overlooking the alleged preference in the case at bar.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/2/2015</u>